**Sharon WARE on Behalf of Demond WARE, a minor, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health & Human Services, Defendant.**

**No. CS–94–242–CI.**

United States District Court, E.D. Washington.

Feb. 22, 1995.

**1264**

George A. Marlton, Spokane, WA, for plaintiff.

**1.** *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885,

Rolf H. Tangvald, Asst. U.S. Atty., U.S. Attorney's Office, Spokane, WA, for defendant.

## ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR ADDITIONAL PROCEEDINGS

IMBROGNO, United States Magistrate Judge.

BEFORE THE COURT are cross-Motions for Summary Judgment, submitted for hearing without oral argument on January 30, 1995. (Ct. Rec. 7, 11.) Plaintiff Sharon Ware, on behalf of her minor child, Demond Ware, appeals the Secretary's decision to deny her child Supplemental Security Income (SSI) benefits pursuant to 20 C.F.R. § 416.924. Attorney George Marlton represents Plaintiff; Assistant United States Attorney Pamela J. De Rusha represents Defendant. The parties have consented to proceed before a magistrate judge. (Ct. Rec. 4.) The court, having considered counsel's briefs, the administrative record and the file, GRANTS IN PART Plaintiff's Motion for Summary Judgment and REMANDS for additional proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Ms. Ware applied for childhood SSI benefits on behalf of her minor child on November 7, 1989. (Tr. at 79.) The application was denied on January 12, 1990, as was a subsequent request for reconsideration. (Tr. at 87, 98.) The matter was reheard consistent with *Zebley*[1] and the application was denied again, as was reconsideration. (Tr. at 103, 104, 118.) On October 5, 1993, a hearing was held before Administrative Law Judge (ALJ) James W. Olson. The claimant's mother, then represented by other legal counsel, and medical expert R. Thomas McKnight testified. On December 10, 1993, the ALJ denied benefits. (Tr. at 12.) The Appeals Council denied review on May 25, 1994. The matter is before this court pursuant to 42 U.S.C. § 405(g).

107 L.Ed.2d 967 (1990).

## ADMINISTRATIVE HEARING

The claimant's mother, Sharon Ware, testified on the claimant's behalf because he was a minor at the time of the administrative hearing. She stated her son, one of five siblings, was then 16 years old and in the tenth grade, a year behind his peers.

Ms. Ware testified her son had been in special education for approximately 15 years, having spent the first years of his life at the Guild School. She first noticed his abnormalities when he was a toddler because of his inappropriate speech and lack of ability to learn. (Tr. at 50–51.) Her son was held back in the second grade after it was discovered he suffered from audio-visual delay. From two months until the age of ten, he suffered from hearing loss due to multiple ear infections. His hearing, however, seemed to have returned to normal after drainage tubes were removed. (Tr. at 51–52.) The claimant underwent speech therapy until the sixth grade to correct a lisp. (Tr. at 53.)

Ms. Ware stated her son has difficulty rising on school mornings. She characterized his room as a "pig sty," his personal hygiene as very poor, and noted he did not help with household chores. (Tr. at 56.) He needed to be told to take a bath, brush his teeth and change his clothes. She stated he returns home at the end of the day with different clothes, having lost several hundred dollars worth of clothing and over twenty keys to the house. (Tr. at 58.)

Ms. Ware testified her son has run away from home seven times in the past two months for up to two weeks. Ms. Ware believes he associates with juveniles who broke into her home in 1992 and assaulted her son, as well as with a young man who threatened her son with a gun. Ms. Ware stated she is very concerned because she does not feel her son can protect himself from these people. (Tr. at 57.)

According to Ms. Ware, her son is forgetful and often gets lost by taking the wrong bus. When he goes to the store, a store clerk usually reads the list of items to be purchased. He refuses to read because it is too difficult. (Tr. at 59.)

In June 1991, the claimant had a bicycle accident, injuring his head, face and mouth. He was admitted to Holy Family Hospital and kept for observation. After the accident, Ms. Ware noticed her son's behavior worsened. (Tr. at 60.) Two years ago, her son began having migraine headaches once or twice weekly. (Tr. at 67.) He sleeps up to 16 hours a day. (Tr. at 68.) Ms. Ware testified her son also experiences occasional fits of rage. (Tr. at 76.)

Ms. Ware testified her son neither participates in sports nor hobbies. He is careless with money and, as a result, she does not give him any cash. He often forgets his school meal card and goes without lunch. (Tr. at 61–62.) At home, Ms. Ware stated her son watches television for hours. He also smokes and drinks alcohol three or four times weekly with his friends. (Tr. at 62.) No drug usage was reported.

During the summer of 1993, her son was employed in the SPEEDY program, a government funded job program for teenagers. She stated he worked for six days as a landscaper, then ran away. (Tr. at 63.) In 1992, he worked during the summer for another employer and had a paper route during the school year. Ms. Ware stated her son refused to deliver the papers after she was hospitalized for medical problems. (Tr. at 64.)

Ms. Ware stated her son does not have patience and will refuse when she asks him to do something. Both mother and son attended counseling at a mental health clinic. After six months, her son refused to cooperate, so they were dropped from the program. Her son was treated for depression, but refused to take his anti-depressant medication. (Tr. at 66.)

Psychologist Thomas McKnight, Ph.D., after reviewing the claimant's records, concluded his problem was primarily intellectual based on a full scale IQ of 76 and a functioning level of fourth or fifth grade. (Tr. at 35, 37, 43.) Dr. McKnight rejected an opinion by Dr. Dennis R. Pollack, that the claimant suffered from a developmental reading and arithmetic disorder and somatoform pain disorder, after finding the conclusion was not

substantiated because the testing procedure was faulty. (Tr. at 36.) Dr. McKnight concluded the claimant showed indications of an oppositional defiant disorder, involving loss of temper, arguments with adults, and a refusal to comply with their requests; doing things deliberately to annoy others; and being angry and resentful. The disorder is associated with a dysfunctional family atmosphere. (Tr. at 37.) Dr. McKnight opined the claimant was capable of reversing his disorder and that no intellectual impairment would preclude him from doing so. (Tr. at 39.)

The ALJ then asked Dr. McKnight to assess certain domains with a reasonable degree of medical certainty regarding the claimant's residual mental capacity, ranging from no limitation to marked or extreme. (Tr. at 40.) The domains included cognitive, communicative, motor, social, personal or behavioral, and concentration, persistence and pace. Dr. McKnight opined limitations in all areas were "less than moderate." (Tr. at 41.) He explained the claimant was functioning at a higher level than that characteristic of mild intellectual impairment. Dr. McKnight concluded the claimant had the ability to work, he simply chose not to work. (Tr. at 41.) Additionally, Dr. McKnight assessed the claimant's limitation regarding his ability to function in the classroom as less than moderate. (Tr. at 42.)

## SCHOOL RECORDS

On January 12, 1982, the school system screened the claimant's gross and fine motor skills. He had no fine motor delays and his manipulation skills appeared to be good. However, the claimant demonstrated a delay in gross motor skills, specifically, balance. (Tr. at 168.) Academic achievement tests, administered on December 9, 1985, indicated sufficiently low scores in word identification, word and passage comprehension to warrant continuing special education. (Tr. at 169.)

On January 15, 1986, the school system administered a psychological assessment. The claimant's strengths included visual perception, motor and short-term memory areas (auditory memory, language and vocabulary understanding). The claimant also demon-

strated strength in problem-solving abilities and tended to "coach or talk himself through difficult situation[s]." Weaknesses included long term memory, auditory memory and auditory processing and vocabulary. (Tr. at 172.) It was recommended the claimant should continue in special education because of the significant discrepancy that existed between his academic skills and his measured ability. (Tr. at 172.)

On January 24, 1986, the school system reevaluated the claimant. Results of a word test revealed a conceptual vocabulary deficit, although voice and fluency were appropriate. (Tr. at 171.)

While in the fifth grade, the Woodcock–Johnson Education Battery tests were administered. Results indicated the claimant was reading at a 2.5 grade level, completing math equations at a 4.2 grade level and writing at a 3.2 grade level. (Tr. at 178.)

On February 25, 1992, the claimant was reevaluated; his reading ability was at a 3.5 grade level, math skills at 5.3, and written language skills at 3.7. (Tr. at 184.) The test was followed by a psychological assessment on March 9, 1992, which noted a severe discrepancy between the claimant's intellectual ability and his current academic achievement in reading, math and written language skills. (Tr. at 185.) The claimant's condition could not be explained by behavioral or health related concerns. (Tr. at 187.)

On March 16, 1992, teacher Ron Liss completed a school activity report, noting the claimant had participated in regular, mid-level physical education activities with no apparent limitations and that his behavior was cooperative. Further, Mr. Liss noted the claimant related well to other students and was able to participate in the same activities as the others. (Tr. at 148.) In fact, Mr. Liss stated he "does what he is asked, willingly." However, Mr. Liss did mention the claimant sometimes lacked concentration and needed to be reminded to stay on task. (Tr. at 149.)

A second questionnaire was completed at the same time by teacher Vernon M. Scott. Mr. Scott opined the claimant was achieving at the expected level and that, while he may

be slow to begin a task, he was comparable to others and did better than many of the students. (Tr. at 150.) Mr. Scott described the claimant as very social and able to get along well with classmates. Mr. Scott also mentioned the claimant, on occasion, does not "choose" to listen to his instructions and, therefore, appears slow in completing his assignments. However, Mr. Scott noted he had not given the claimant any special or extra help and that his work was acceptable. (Tr. at 151.)

October 27, 1992, the claimant's counselor noted a discrepancy between the claimant's intellectual ability and his current academic achievements in reading, math and language activities. Additionally, it was mentioned he was very easily distracted which adversely affected his performance. The counselor opined the claimant had difficulty with authority as evidenced by a quick temper, although he generally followed classroom rules. The counselor also noted the claimant's friends were participants in the specialized program. (Tr. at 162.)

On October 29, 1992, English teacher Shirley Bjorge mentioned the claimant experienced attention problems which inhibited him from performing at his potential. While there was some improvement, Ms. Bjorge noted he was still reading three to four years below his grade level. She characterized his behavior as "usually appropriate" and noted the fact, as far as she knew, he got along well with other students. (Tr. at 164.) Ms. Bjorge reported the claimant required special supervision, often needing to be refocused to his tasks. However, she also stated the claimant responded favorably to re-direction and re-focusing, and that he was a likeable person and "wants to please." (Tr. at 165.)

### MEDICAL HISTORY

During his infancy and childhood, the claimant suffered from numerous ear infections and chronic hearing loss. Surgery was scheduled in 1978, but canceled after the child experienced grand mal seizures which continued until the age of three and one half years. (Tr. at 225.) Later, an adenoidectomy and myringotomy and collar button tubes were inserted into his ears. (Tr. at 194.) Following surgery, there were incidents of bleeding from the ears. (Tr. at 225.) At one point, doctors concluded the hearing problem was psychiatric and made a referral to a psychiatrist. (Tr. at 226.)

On May 15, 1979, the claimant underwent a computerized test by Dr. William Bond that revealed an abnormal brain stem auditory evoked response with marked delay in the right cochlear nerve. Dr. Bond also noted the claimant had suffered from a poorly controlled seizure disorder since the age of nine months. (Tr. at 202–03.) Additionally, the claimant was assessed with bilateral chronic otitis media and probable right cochlear dysfunction. (Tr. at 203.) Dr. Bond concluded the claimant's mental condition was less than perfect, both for auditory information and general functioning of a 2½ year old. (Tr. at 203.)

On November 3, 1980, the Spokane Guild School administered the Houston Test for Language Development and the Photo Articulation Test. (Tr. at 206.) The tests revealed the claimant was six months below his chronological age in language development and one year behind in articulation. (Tr. at 206.) At the time, the claimant's hearing appeared normal. (Tr. at 206.) Based on the testing results, the claimant began communication therapy. (Tr. at 206.)

A progress report on the claimant was completed in June 1981. His language development was measured at a 46–month level. Deficits remained in the areas of auditory comprehension and processing, expressive language, syntax, grammar, language concepts and articulation skills. Based on these results, communication therapy was continued. (Tr. at 211.)

On July 16, 1982, pediatrician Peter Holden examined the claimant during a well-care visit. Claimant's mother expressed concern about his speech disorder and hearing impairment. Dr. Holden noted the claimant had been examined by Dr. Miller approximately one month previously, who assessed Plaintiff's hearing at a one decibel loss. Otherwise, Plaintiff's condition appeared normal. (Tr. at 274.)

Dr. Holden saw the claimant on July 11, 1983; an examination revealed nothing remarkable although the learning disability seemed to persist. (Tr. at 275.)

On March 19, 1985, the drainage tube in the left ear was removed. An audiogram showed the claimant had good hearing bilaterally. (Tr. at 231.)

On December 9, 1986, the claimant returned to Dr. Miller because of drainage seeping from his right ear. Antibiotics and drops were prescribed. (Tr. at 233.) On March 10, 1987, the drainage tube was surgically removed from the right ear and the ear drum was patched with Gelfilm. (Tr. at 218–220.) The site then healed completely. (Tr. at 234.)

The next series of appointments in 1989 with Dr. Holden address weight concerns raised by Ms. Ware. Although the child's diet was lacking in fruits and vegetables, his caloric intake was acceptable. Subsequently, Dr. Holden suggested Ms. Ware seek counseling regarding her expectations for her son. (Tr. at 281.)

On June 1, 1989, the claimant was admitted to Holy Family Hospital, believed to be suffering from meningitis. After testing, meningitis was ruled out and the claimant was discharged on June 3, 1989. (Tr. at 222.)

On August 30, 1990, and January 28, 1991, Dr. Holden treated two fractures, one involving the left hand and the other, the ankle. (Tr. at 284.) On July 30, 1991, the claimant was admitted to Holy Family Hospital because of head injuries sustained during a bike accident. (Tr. at 239, 285–86.) A neurological exam was normal and the claimant was released the next day. (Tr. at 241–44.)

Progress notes from the Spokane Mental Health Clinic record counseling sessions occurring from January to August 1992, when therapy was discontinued due to lack of progress. (Tr. at 313.) Counselor Wes Heimbecker's initial assessment dated January 1992 indicates counseling was sought because of the claimant's increasing problems with memory and attention span. (Tr. at 253.) The claimant's history indicated his upbringing by his mother had been abusive, including physical and emotional violence. The claimant did not know his father. (Tr. at 254.) The claimant related his academic history included C's and higher in junior high. He indicated an interest in sports and the fact he had done yard work and babysitting. He denied using alcohol or drugs and admitted to chewing tobacco on occasion. He indicated an interest in art work and described it as a strength. Anger control was particularly noted by the counselor as a problem to be addressed. (Tr. at 255.) It was concluded the claimant suffered from an oppositional defiant disorder and developmental disorder, NOS. The claimant's current level of functioning was described as poor, with particular limitations in educational, emotional, family and domestic violence issues. (Tr. at 256.)

On February 11, 1992, Mr. Heimbecker met with school authorities and Ms. Ware. He noted the claimant intentionally misrepresented situations to avoid responsibility for his actions. (Tr. at 269.) Additionally, Ms. Ware felt her son was suffering from an attention deficit disorder. After the meeting, grades improved significantly in language arts class, but dropped in math because of a dislike for the math teacher. (Tr. at 270.) On March 11, 1992, it was noted the claimant's grades had improved. A need to stress the importance of school work was explained to Ms. Ware. A conclusion was made that the claimant had the ability to do class work, but had chosen not to do so.

On April 26, 1992, the claimant saw psychologist Dr. Samuel W. Delaney, Jr. An IQ test revealed the claimant's low average intelligence. (Tr. at 250.) Dr. Delaney opined the claimant's performance was influenced by a low frustration level which required continued intervention. Additionally, Dr. Delaney noted the claimant's behavioral responses in the classroom were associated with the significant deficits created by his learning disabilities. (Tr. at 251.)

On May 4, 1992, the claimant attended a counseling session without his mother. (Tr. at 252.) He discussed an incident where he was chased by a man with a gun who later was arrested. Mr. Heimbecker speculated the claimant did not have a clear grasp of the potential danger. The claimant also de-

scribed himself as a "ladies man" because of interest shown in him by several girls.

On May 5, the claimant was diagnosed with dysthymia and medication was prescribed. (Tr. at 273.) The medication was adjusted in June. (Tr. at 310.) In July, the claimant reported he had quit taking the medication but would resume taking it. In August, the claimant admitted to engaging in high risk behavior. It was indicated Ms. Ware had lost control of her son and that therapy would not be successful. In September, it was reported the claimant was getting into more trouble. He regularly defied his mother and did not seem willing to try to be more cooperative. (Tr. at 312.)

In June and August 1993, Dr. Pollack administered several psychological tests. A low range of intelligence was demonstrated. The results of the Minnesota Multiphasic Personality Inventory (MMPI) test indicated a mildly elevated F-scale, indicating malingering, a cry for help or difficulty understanding the items. (Tr. at 305.) Dr. Pollack concluded it was unlikely the claimant was malingering. The claimant's profile revealed a person who had many vague physical complaints, including pain, weakness, fatigue and insomnia. Such physical complaints typically mask more serious emotional problems. (Tr. at 305.) The results of the Bender–Gestalt Visual Motor Test were very poor. Additionally, the results of the Trail Making Test indicated an impairment.

Dr. Pollack observed the claimant work hard at the tasks presented to him. He noted the claimant required his mother's help to complete the intake form. Dr. Pollack found the claimant's verbal score was consistent with his need for special education for English and mathematics. The personality testing revealed a significant preoccupation with physical complaints and depression. Neuropsychological screening indicated the claimant had significant organic problems. Dr. Pollack's diagnosis included somatoform pain disorder, dysthymia, developmental reading disorder and developmental arithmetical disorder. (Tr. at 306.)

On September 23, 1993, Dr. Pollack completed a mental residual functional capacity assessment. He determined the claimant was markedly limited in his ability to understand, remember and carry out detailed instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, and set realistic goals. (Tr. at 307–08.) Dr. Pollack concluded: "Mr. Ware has significant educational, intelligence and emotional problems. He has been in special educational [sic] throughout his educational history. His verbal IQ is 69 indicating a significant verbal deficit. His physical complaints mask significant emotional problems." (Tr. at 309.)

On April 22, 1994, the claimant again was examined by Dr. Pollack. (Tr. at 316.) Dr. Pollack found the claimant's limitations with respect to cognitive development marked, and his communicative development, moderate. (Tr. at 316.) There was no evidence of limitation regarding motor development, but his social development was assessed at less than moderate. (Tr. at 317.) Additionally, limitations on personal and behavioral development were considered moderate, and limitations as to concentration, persistence and pace were diagnosed as marked. (Tr. at 317.)

### ISSUES

The question presented is whether there is substantial evidence to support the Secretary's decision and whether it is based on proper legal standards. The claimant first contends his impairments meet the Listings for childhood impairments: Part B, sections 112.04(A)(1)(g) and 112.05. Alternatively, it is argued the ALJ's opinion was not supported by substantial evidence and that he incorrectly relied on the opinion of a non-examining medical expert rather than the opinion of a doctor who had examined the claimant.

### SEQUENTIAL EVALUATION PROCESS

■ The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining benefits to be awarded a child, the Secretary formerly was governed by a modified version of the adult test.[2] That approach, however, was rejected by the Supreme Court in *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). In determining whether a child suffers from a disability, the ALJ must consider the following issues: (1) whether the child engaged in substantial gainful activity, (2) whether the child's impairment is so severe as to cause more than a minimal limitation on the child's ability to function in an age-appropriate manner, (3) if the impairment is severe, whether it meets or equals an impairment listed in Appendix 1, Subpt. P of 20 C.F.R. Part 404, and (4) if the child's impairment does not meet or equal a listed impairment, whether the impairment is of comparable severity to one which would disable an adult. This step requires an individualized functional assessment based on the Secretary's evaluation of all of the evidence.

## ALJ'S FINDINGS

The ALJ determined the claimant was not disabled with respect to his physical limitations. The ALJ found substantial gainful activity was not an issue. He concluded the medical evidence established borderline intellectual functioning with moderate limitations in all areas of development and function. However, the ALJ found no learning disability, somatoform pain disorder, or dysthymia and thus, concluded the impairments did not meet or equal the medical requirements for disability under any identifiable impairment contained in Appendix 1, Subpart P, Regulation No. 4.

**2.** A child qualified for benefits if he or she was not engaging in any substantial gainful activity, § 416.924(a); if the impairment met the duration requirement, § 416.924(b)(1); and if it was comparable to a listed impairment, §§ 416.924(b)(2) and (3). In evaluating a child's claim, both the general listings and a special listing of children's impairments, 20 C.F.R. Pt. 404, Subpt. P. App. 1 (pt. B) (1989) was considered. If a child did not qualify under the listings, benefits were denied;

The ALJ discredited Dr. Pollack's opinions, observing: The claimant was referred to the doctor by his attorney; Dr. Pollack did not have the entire medical record before him when making his decision; and Dr. McKnight's reasons for rejecting Dr. Pollack's report were persuasive, as were his conclusions.

## STANDARD OF REVIEW

■ "The Secretary's determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence, 42 U.S.C. § 405(g)...." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir.1983). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir.1975), but less than a preponderance. *McAllister v. Sullivan*, 888 F.2d 599, 601–602 (9th Cir.1989); *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). "[S]uch inferences and conclusions as the Secretary may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir.1965); *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir.), *cert. denied*, 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1972). On review, the court considers the record as a whole, not just the evidence supporting the decision of the Secretary. *Weetman v. Sullivan*, 877 F.2d 20 (9th Cir.1989); *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).

## ANALYSIS

■ The claimant first argues his impairment meets the Listings under 20 C.F.R., Pt. 404, Subpt. P, § 112.04[3] and there was no further inquiry at steps four and five as required in the adult analysis.

**3.** 20 C.F.R. Pt. 404, Subpt P, App. 1 § 112.04 provides:

*Mood Disorders:* Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), ac-

§ 112.05 [4]. The court initially notes the reference in Plaintiff's brief concerning "§ 112.04(G)" cannot be found; therefore, the court will not review that Listing, after concluding there is no evidence of a mood disorder which could be characterized as a major or manic depressive syndrome or a bipolar disorder as defined in § 112.04. Thus, the evidence is reviewed to determine if it meets the Listings of § 112.05.

■ As noted in the medical history, the claimant has spent his entire educational career in special education classes. In 1992, the claimant's IQ was tested by Dr. Delaney and measured 78 (verbal), 87 (performance) and 81 (full scale). Dr. Delaney concluded the low score was the result of significant learning disabilities. A year later, Dr. Pollack administered IQ tests and obtained the following results: 69 (verbal), 76 (performance) and 71 (full-scale). Dr. Pollack also concluded the claimant had marked limitations in cognitive development and concentration, persistence and pace. It follows that, absent an invalid test procedure, the claimant would meet the Listings under § 112.05E(2).

The consulting expert, Dr. McKnight concluded Dr. Pollack's results were flawed because the test administered was not designed for juveniles, but for adults. Dr. McKnight also noted the literature was replete with information that the overall scores displayed by adolescents "looks to be more pathological than reality." (Tr. at 36.) Dr. McKnight concluded the claimant's IQ was more proba-

companied by a full or partial manic or depressive syndrome.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Major depressive syndrome, characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:

  a. Depressed or irritable mood; or

  b. Markedly diminished interest or pleasure in almost all activities; or

  c. Appetite or weight increase or decrease, or failure to make expected weight gains; or

  d. Sleep disturbance; or

  e. Psychomotor agitation or retardation; or

  f. Fatigue or loss of energy; or

  g. Feelings of worthlessness or guilt; or

  h. Difficulty thinking or concentrating; or

  I. Suicidal thoughts or acts; or

  j. Hallucinations, delusions, or paranoid thinking;

OR

2. Manic syndrome, characterized by elevated, expansive, or irritable mood, and at least three of the following:

  a. Increased activity or psychomotor agitation; or

  b. Increased talkativeness or pressure of speech; or

  c. Flight of ideas or subjectively experienced racing thoughts; or

  d. Inflated self-esteem or grandiosity; or

  e. Decreased need for sleep; or

  f. Easy distractibility; or

  g. Involvement in activities that have a high potential of painful consequences which are not recognized; or

  h. Hallucinations, delusions, or paranoid thinking;

OR

3. Bipolar or cyclothymic syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently or most recently characterized by the full or partial symptomatic picture of either or both syndromes);

AND

B. ... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 [marked impairment of cognitive function, social function, or personal/behavior function] of 112.02.

4. 20 C.F.R. § 112.05 provides:

*Mental Retardation:* Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.

.   .   .   .   .

D. A valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation of function;

OR

E. A valid verbal, performance, or full scale IQ of 60 through 70 and:

.   .   .   .   .

2. For children (age 3 to attainment of 18), resulting in at least one of paragraph B2b [marked impairment in age appropriate social functioning] or B2c [marked impairment in personal/behavioral function] or B2d [deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner] of 112.02;

bly in the range of 73 (verbal), 82 (performance) and 76 (full-scale) based on a four to six point decrease from Dr. Delaney's results because the test version had been modified.

As noted in the regulations, IQ test results must be sufficiently current for an accurate assessment under section 112.05. 20 C.F.R. Pt. 404, Subpt. P, App. 1(D). The results of an IQ test stabilizes at age 16; test results obtained between the ages of 7 and 16 should be considered current for two years when the IQ is tested at 40 or above. Therefore, Dr. Delaney's scores were valid. As noted in the regulations, standardized intelligence test results are essential to the adjudication of disability based on mental retardation.

■■■ The medical opinions of treating physicians, as opposed to those of the examining physicians, are accorded special weight, *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir.1988), because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.1987). In the absence of a contradictory opinion by another doctor, the ALJ can disregard the opinion of the treating physician only by setting forth clear and convincing reasons. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). Moreover, to the extent Plaintiff's treating physicians' medical conclusions rest on objective clinical tests, it must be viewed as substantial evidence. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1984); *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985).

Here, neither Drs. Delaney nor Pollack were treating physicians, but were employed to determine the claimant's intellectual and emotional profile. The test results, obtained within the space of one year, were somewhat inconsistent. The claimant's intelligence as tested by Dr. Delaney was significantly higher. The record reflects Dr. McKnight's reason for rejecting Dr. Pollack's results is proper because the test used was not designed for adolescents. Based on Dr. Delaney's results, the claimant does not meet the Listings under § 112.05.

■■■ The claimant also may establish disability by demonstrating his condition is equal to the Listings in that his or her overall ability to function independently, appropriately, and effectively in an age-appropriate manner is impaired. 20 C.F.R. § 416.924(f). An inability to perform work-related activities is the most important indicator of impaired functioning in older adolescents, aged 16 to attainment of age 18. 20 C.F.R. § 416.924b(b)(4). All factors relevant to the evaluation of the effects of an impairment on functioning are considered, including functioning in school and whether placement in a special classroom is necessary. 20 C.F.R. § 416.924c(d). In evaluating an adolescent, aged 16 or older, school activities are considered as evidence of an ability to function in a job setting. Evidence to be considered includes an ability to communicate spontaneously, interactively, and age-appropriately in the classroom, as well as an ability to maintain attention for an extended period and to sustain an ordinary daily routine without special supervision. Other factors include an ability to deal with authority figures and to follow directions in school, respond appropriately to correction or criticism, interact with peers in school, participate in school-related activities, regulate mood and behavior in various school settings and engage in any physical pursuits. 20 C.F.R. § 416.924d(j)(2). If the individualized functional assessment shows a substantial loss or deficit of capacity to perform work related activities, then a finding the impairment seriously interferes with the ability to function independently would be made and disability found. 20 C.F.R. § 416.924e(d)(4). Substantial loss or deficit means a claimant is unable to meet the basic mental demands of at least unskilled work or that the impairment would severely limit the potential occupational base of a person age 18 through 45. 20 C.F.R. § 416.924e(d)(4)ii.

The ALJ specifically found the claimant was moderately limited in several domains, including cognitive, communicative, motor, social, and personal/behavioral development and concentration, persistence and pace. Had the claimant not attained the age of 16, these findings would be sufficient to qualify the claimant for a disability. 20 C.F.R. § 416.924e(c)(2)ii.

It is undisputed the claimant's intelligence level is low. The record reflects claimant also suffered from significant emotional problems, either caused or exacerbated by his abusive upbringing and his mother's inability to properly parent him. Reports from school in 1992 indicated the claimant was performing adequately and that he was able to get along with other students. He had no physical limitations. However, his reading ability was measured at a 3.5 grade level, math skills at grade 5.3, and written language skills at grade 3.7. Additionally, it was noted the claimant has speech problems and drinks alcohol several times a week. (Tr. at 307.) A concern was expressed regarding the claimant's ability to remain focused on assigned tasks. (Tr. at 148–50, 184.)

The court recognizes the assessment of a child's disability is made under a modified version of the five-step sequential review utilized in the determination of adult disability. *Zebley,* 493 U.S. at 538–41, 110 S.Ct. at 896. *Zebley* distinguishes between a functional analysis as opposed to a vocational analysis, after accepting the Secretary's argument there is no practical way to determine a child's vocational potential because no work has been performed. *Id.* at 538–41, 110 S.Ct. at 896. However, this court also recognizes, while the rationale for not employing steps four and five of the adult process (a vocational analysis) is valid for determining a child's disability when that child is under the age of 16, that rationale disappears when evaluating the disability of an adolescent, aged 16 to 18. As required by the regulations, the ALJ must determine whether, in light of the residual functional capacity of the adolescent, substantial gainful activity can be performed. That finding is made with reference to the adult standard and necessarily implies a vocational analysis, as well as a functional analysis. *See* 20 C.F.R. § 416.925e(d)(4). Had this been a decision involving an adult, an assessment of the residual capacity to work, given the non-exertional limitations, would have been presented to a vocational expert. That was not done here because the claimant was under 18. Rather, the ALJ made certain conclusions the claimant would be able to hold a job, despite his moderate impairment in several

critical areas and his unsuccessful work history. The ALJ chose to rely on the consulting physician's conclusion the claimant's poor academic performance was volitional, rather than the result of a mental impairment or learning disability. Although this conclusion has some evidentiary support, considering the record as a whole, it is insufficient to support the Secretary's decision.

There was a gross disparity between the description of the claimant's behavior in school as compared to his behavior at home, at work, and after school hours as described by his mother. The court further notes there was no credibility finding as to the mother's testimony; thus, it must be viewed as credible. She testified to the claimant's evolving pattern of risky behavior, including the regular and illegal consumption of alcohol and cigarettes, running away from home for extended periods of time, and consorting with persons of questionable character. Additionally, there was evidence the claimant was easily confused and manipulated, as indicated by his loss of clothing. Finally, there was some question as to his ability to perform daily activities involving personal hygiene. The court does not find this type of behavior indicative of an ability to perform work-related activities.

Because the claimant's limitations are non-exertional and because the court views the burden of persuasion as belonging to the Secretary, a vocational expert is needed to provide evidence the claimant is unable to engage in either past work or other work. 42 U.S.C. § 1382c(a)(3)(B); *Zebley,* at 527–29, 110 S.Ct. at 890. Finally, the court suggests that, if, upon remand, the ALJ should determine benefits are warranted, a protective payee, other than claimant's mother, be named to manage the claimant's funds. Accordingly,

**IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment is **GRANTED IN PART;** the cause is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for additional proceedings consistent with this opinion.

2. Any application for attorney fees shall be made by separate motion.

3. The Clerk is directed to file this Order and provide a copy to counsel for Plaintiff and Defendant. The file shall be closed and judgment entered in favor of Plaintiff.